IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS WISNIEWSKI, | : | |
| | : | No. 1:16-cv-1626 |
| Plaintiff, | : | |
| | : | PROFESSIONAL LIABILITY |
| v. | : | |
| | : | |
| JAMES F. FROMMER, Jr., D.O., | : | (Judge Kane) |
| ANDREW J. DANCHA, D.O., | : | |
| DEBORAH CUTSHALL, | : | (Magistrate Judge Carlson) |
| CORRECT CARE SOLUTIONS, LLC, | : | |
| WILLIAM DREIBELBIS, R.N., | : | |
| PAUL A. NOEL, M.D., | : | |
| EUGENE H. GINCHEREAU, M.D., | : | JURY TRIAL DEMANDED |
| KATHY MONTAG, | : | |
| JODI WHITE, | : | |
| ANDREA NORRIS, R.N., | : | |
| JOSEPH J. SILVA, R.N., | : | |
| CHRISTOPHER OPPMAN, and | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
|   CORRECTIONS, | : | |
| | : | ELECTRONICALLY FILED |
| Defendants. | : | |

## SECOND AMENDED COMPLAINT

Plaintiff Thomas Wisniewski, a state prisoner, brings this action under 42

U.S.C. §§ 1983 & 1988 for violations of the Eighth Amendment of the United

States Constitution.  Plaintiff also seeks relief available pursuant to Pennsylvania

law for injuries through medical malpractice and breach of contract, including but

not limited to specific performance of contract.  Plaintiff further seeks injunctive

relief, to the extent available under 18 U.S.C. § 3626, to halt violations of the

Eighth Amendment and of Article 1, Section 13 of the Declaration of Rights of the Constitution of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred at the State Correctional Institution at Smithfield in Huntingdon County, Pennsylvania, and at the State Correctional Institution at Camp Hill, in Cumberland County, Pennsylvania.

3.      This matter was filed initially in the Court of Common Pleas for Huntingdon County, Pennsylvania.  Defendants removed this case to federal court pursuant to 28 U.S.C. § 1441.

## PARTIES

4.      The plaintiff, Thomas Wisniewski, is a prisoner in the custody of the Pennsylvania Department of Corrections (DOC).  Wisniewski was incarcerated at the State Correctional Institution at Smithfield (SCI Smithfield) as inmate #EN-9105 until August 18, 2016.  Thereafter, he was incarcerated at the State Correctional Institution at Camp Hill (SCI Camp Hill), where he remained until he was returned to SCI Smithfield on September 8, 2016.

2

5.      Defendant James F. Frommer, Jr., D.O. is a physician employed by Correct Care Solutions, LLC, under a contract with DOC, and serves as medical director at SCI Smithfield.  Defendant Frommer was a willful participant in joint activity with a state entity, DOC.  Defendant Frommer performed functions in providing medical care that are non-delegable constitutional duties of the state, such that he became a state actor, acting under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment which Defendant Frommer failed to perform.  Defendant Frommer violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.  Defendant Frommer is currently licensed for the practice of osteopathic medicine in Pennsylvania under license #OS-009673L.  Plaintiff is additionally asserting a professional liability claim and other claims against this defendant.

6.      Defendant Andrew J. Dancha, D.O. is a physician employed by Correct Care Solutions, LLC, under a contract with DOC, and serves as Regional Medical Director for DOC prisons in Central Pennsylvania.  In that capacity, he supervises Frommer.  Defendant Dancha was a willful participant in joint activity with a state entity, DOC.  Defendant Dancha performed functions in providing medical care that are non-delegable constitutional duties of the state, such that he became a state actor.  Defendant Dancha acted  under color of state law at all

relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment which Defendant Dancha failed to perform.  Defendant Dancha violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.  Defendant Dancha's license to practice osteopathic medicine in Pennsylvania, #OS-007173L, was suspended in early 2011 after he pled guilty to fraud involving prescription drugs.  The license was reinstated in October 2012 after Defendant Dancha served 21 months in federal prison.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.

7.     Defendant Deborah Cutshall is the Health Services Administrator at SCI Smithfield and is employed by Correct Care Solutions, LLC, under a contract with DOC.  Defendant Cutshall was a willful participant in joint activity with a state entity, DOC.  Defendant Cutshall performed functions in providing medical care  that are non-delegable constitutional duties of the state, such that she became a state actor.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment which Defendant Cutshall failed to perform.  Defendant Cutshall acted  under color of state law at all relevant times.  Defendant Cutshall violated the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.

4

8.     Defendant Correct Care Solutions, LLC (CCS) is a Kansas corporation with headquarters in Nashville, Tennessee.  CCS is registered to conduct business in this Commonwealth as entity no. 4107332.  CCS currently provides medical care to prisoners, including Plaintiff, under a contract with DOC that runs through June 30, 2021 and pays CCS a base rate of $313,886,900.00 plus adjustments and bonuses of various kinds.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.  Defendant CCS, a private entity, was a willful participant in joint activity with a state entity, DOC. Defendant CCS performed functions in providing medical care that are non-delegable constitutional duties of the state, such that Defendant became a state actor.  Defendant CCS acted  under color of state law at all relevant times. The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment which Defendant CSS failed to perform. Defendant CCS violated the Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.

9.     Defendant William Dreibelbis, R.N., is a nurse employed by DOC as Corrections Health Care Administrator at SCI Smithfield.  Defendant Dreibelbis was a willful participant in joint activity with a state entity, DOC.  Defendant Dreibelbis performed functions in providing medical care that are non-delegable constitutional duties of the state, such that he became a state actor.  Defendant

5

Dreibelbis acted  under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Dreibelbis failed to perform.  Defendant Dreibelbis violated the Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.  Defendant Dreibelbis is currently licensed as a registered nurse in Pennsylvania under license #RN504139L.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.

10.    Defendant Paul A. Noel, M.D., is a physician employed by DOC as Chief of Clinical Services in the DOC's Bureau of Health Care Services (BHCS).  For part of the relevant time, he was Acting Director of BHCS.  He is responsible for "government contract monitoring" for Defendant DOC as of January 2014, according the profile that he displays on LinkedIn.  Defendant Noel was a willful participant in joint activity with a state entity, DOC.  Defendant Noel performed functions in providing medical care that are non-delegable constitutional duties of the state, such that he became a state actor.  Defendant Noel acted under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Noel failed to perform.  Defendant Noel violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious

6

medical needs.  Defendant Noel is currently licensed as a physician in Pennsylvania under license #MD039807L.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.

11.    Defendant Eugene H. Ginchereau, M.D., is employed by DOC as Assistant Medical Director of the DOC's Bureau of Health Care Services (BHCS). Defendant Ginchereau was a willful participant in joint activity with a state entity, DOC.  Defendant Ginchereau performed functions in providing medical care  that are non-delegable constitutional duties of the state, such that she became a state actor.  Defendant Ginchereau acted under color of state law at all relevant times. The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Ginchereau failed to perform.  Defendant Ginchereau violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.  Defendant Ginchereau is currently licensed as a physician in Pennsylvania under license #MD0175351E.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.

12.    Defendant Kathy Montag was employed by DOC as a Medical Contract Monitor in the Bureau of Health Care Services at times relevant to this action.  Defendant Montag was a willful participant in joint activity with a state entity, DOC.  Defendant Montag performed functions in providing medical care

7

that are non-delegable constitutional duties of the state, such that she became a state actor.  Defendant Montag acted under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Montag failed to perform.  Defendant Montag violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.

13.     Defendant Jodi White is employed by DOC as a Medical Contract Monitor in the Bureau of Health Care Services.  Defendant White was a willful participant in joint activity with a state entity, DOC.  Defendant White performed functions in providing medical care that are non-delegable constitutional duties of the state, such that she became a state actor.  Defendant White acted under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant White failed to perform.  Defendant White violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.

14.     Defendant Andrea Norris, R.N., is a nurse employed by DOC.  For part of the relevant time, she was Acting Director of the Bureau of Health Care Services.  Defendant Norris was a willful participant in joint activity with a state

entity, DOC.  Defendant Norris performed functions in providing medical care that are non-delegable constitutional duties of the state, such that she became a state actor.  Defendant Norris acted under color of state law at all relevant times. The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment which Defendant Norris failed to perform.  Defendant Norris violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs. She is currently licensed as a registered nurse in Pennsylvania under license #RN297220L.  Plaintiff is also asserting a professional liability claim and other claims against this defendant.

15.     Defendant Joseph J. Silva, R.N., is a nurse employed by DOC as Director of the Bureau of Health Care Services.  Defendant Silva was a willful participant in joint activity with a state entity, DOC.  Defendant Silva performed functions in providing medical care that are non-delegable constitutional duties of the state, such that he became a state actor.  Defendant Silva acted under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Silva failed to perform.  Defendant Silva violated the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.   He is currently licensed as a registered nurse in Pennsylvania under

license #RN261865L.  Plaintiff also is asserting a professional liability claim and other claims against this defendant.

16.     Defendant Christopher Oppman is employed by DOC as Deputy Secretary for Administration.  He was Director of the Bureau of Health Care Services for some time relevant to this action.  Defendant Oppman was a willful participant in joint activity with a state entity, DOC.  Defendant Oppman performed functions in providing medical care  that are non-delegable constitutional duties of the state, such that he became a state actor.  Defendant Oppman acted under color of state law at all relevant times.  The state has a non-delegable obligation to provide medical treatment for prisoners in its custody under the Eighth Amendment, which Defendant Oppman failed to perform. Defendant Oppman violated Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to Plaintiff's serious medical needs.

17.     Defendant the Department of Corrections (DOC) is an agency of the Commonwealth of Pennsylvania, which pursuant to 42 Pa.C.S. § 8522(b)(2), waives its sovereign immunity from liability in tort for injuries caused by its physicians and nurses.

18.     The physicians and nurses who treated Plaintiff were each acting in their individual capacity with respect to Section 1983 because they were trained to perform medical treatment as physicians and nurses, and were doing so.  However,

10

these individuals were also acting in their official capacity with respect to the asserted medical malpractice claims because they were contractors of the Commonwealth who were delegated the duty to provide medical treatment to prisoners in the Commonwealth's custody.

## FACTS

### Contracts for Health Care for Inmates

20.     DOC provides health care for prisoners through private contractors that Defendant DOC elects to retain.

21.     DOC employees have oversight responsibility to ensure that the employees of the medical contractor provide inmates with health care consistent with the terms of the contract and with community standards of care.

19.     Prior to September 2014, DOC's health care contractor was Wexford Health Sources, Inc. of Pittsburgh.  DOC and Wexford terminated their contract as of August 31, 2014.

20.     Wexford employed Defendant Dancha in a supervisory capacity as a regional director for the region that includes SCI Smithfield.  Defendant Dancha continued in the same position as an employee of CCS after September 1, 2014.

21.     CCS provided medical care for DOC inmates under a contract executed on an emergency basis for the period September 1, 2014 through August 31, 2015.  See Appendix at 4.  The parties to that contract intended it to provide

"comprehensive medical services to the DOC inmates."  (Hereinafter "2014-15 contract.")

22.   CCS continues to provide DOC inmates with health care under a multi-year contract executed on July 9, 2015.  See Appendix at 5-7.  The parties to that contract intend it "to provide health care services to the inmate population of the Pennsylvania Department of Corrections."  (Hereinafter "2015-2021 contract" or "current contract.")

23.   Plaintiff, as an inmate of a DOC prison, is an intended third-party beneficiary of both of the CCS contracts with DOC.

24.   At SCI Smithfield, Defendant Dreibelbis, as DOC's Corrections Health Care Administrator (CHCA), was and is responsible to monitor and enforce contract compliance by Defendant Correct Care Solutions, LLC and its employees Defendants Frommer and Cutshall.

25.   DOC's Procedures Manual for Management and Administration of Health Care provides that the CHCA is responsible to ensure that DOC's contracted health care provider complies with the contract.  DOC Policy 13.1.1 §3.A.3.  Policies of Defendant DOC are available at www.cor.pa.gov.

26.   At DOC's central administrative offices, the DOC employees responsible for monitoring and enforcing contract compliance by CCS and its employees, including Defendants Dancha, Frommer, and Cutshall, were:

Defendants Noel, while he was Chief of Clinical Services; Ginchereau, as

Assistant Medical Director; Norris, Noel, Oppman, and Silva, during the periods of

time when each consecutively served as Director of the Bureau of Health Care

Services; and Oppman, after he became Deputy Secretary for Administration.

Under DOC Policy 13.1.1, "Management and Administration of Health Care,"

Defendants had responsibility to conduct and monitor reviews of the professional

conduct of CCS employees when the Defendants served as Director of BHCS or as

Chief of Clinical Services, as did Noel, Norris, Oppman, and Silva at various times

relevant to this action.  Policy 13.1.1 § 12.

      27.     Defendants Noel, Ginchereau, Norris, Silva, and Oppman had

responsibility for implementation of DOC Policy 13.1.1, including its Section 10,

"Maintenance of Inmate Medical Records."  Hence, each of them had constructive

knowledge of the contents of Plaintiff Wisniewski's medical records.

      28.     Defendants Noel, Ginchereau, Norris, Silva, and Oppman also had

supervisory responsibility for those DOC employees, specifically Defendants

Dreibelbis, Montag, and White, who worked directly with CCS employees in

various circumstances as provided in DOC Policies 13.1.1 and 13.2.1 and in the

contracts.  See Appendix at 4-7.  Because of the employment relationship between

these Defendants and the state as employees, they were either state actors, or

alternatively, acted under color of state law by performing the state's non-

delegable constitutional duties under the Eighth Amendment to provide medical care to prisoners.

29.     The contracts designated in the Appendix are incorporated by reference in this Complaint.

## Policies, Practices, and Protocols Required by Contracts

30.     Defendant CCS was required by the 2014-15 contract to provide health care services for inmates that met or exceeded good and acceptable medical standards, and to ensure that the care was consistent with applicable DOC policies and protocols, as currently existing or subsequently revised.

31.     Defendant CCS was required by the 2014-15 contract to provide inmates with specialty medical services in neurosurgery, physical therapy, pain medicine, and other medical specialties, and to assure timely follow-up for recommendations made by specialists.

32.     Defendant CCS was required by the 2014-15 contract to refer inmates at SCI Smithfield, like Plaintiff Wisniewski, to one of three named local specialists in pain medicine when needed.

33.     Defendant CCS was required by the 2014-15 contract to provide outpatient surgery and diagnostic procedures for inmates, such as MRIs and CAT scans, when needed.

34.    Defendant CCS was required by the 2014-15 contract to develop and manage a formulary of medications in collaboration with DOC and DOC's pharmacy contractor and to collaboratively establish and execute pharmacotherapeutic procedures.

35.    The DOC's Chief of Clinical Services, that is, Defendant Noel, was required by the 2014-15 contract to conduct semi-annual reviews of contract performance by CCS and its employees, known as "quality improvement meetings," and, in addition, to ensure that such reviews and meetings were conducted at each prison on a monthly basis.

36.    Defendant CCS is required by the 2015-2021 contract, currently in effect, to comply with DOC Policy 13.1.1, "Management and Administration of Health Care," and DOC Policy 13.2.1, "Access to Health Care."  Policies of Defendant DOC are available at www.cor.pa.gov.

37.    Defendant CCS is required by its current contract to effectively treat medical and mental health disorders at a level consistent with community standards of care.

38.    Defendant CCS is required by its current contract to provide palliative care, which is defined in DOC Policy 13.2.1 as:

> The active total care of inmates whose disease is not responsive to curative treatment.  Palliative care includes the control of

15

> symptomatic pain . . . . The goal of palliative care is the achievement of the best possible quality of life for the inmate.

39.     Defendant CCS is required by its current contract, incorporating DOC Policy 13.2.1, to provide for an annual specialty consultation at a Veterans Administration hospital for inmates like Plaintiff Wisniewski who are disabled veterans.  Policy 13.2.1 § 1.A.6.n.3.

40.     Defendant CCS is required by its current contract to provide chronic care clinics.

41.     Defendant CCS is required by its current contract, incorporating DOC Policy 13.2.1 § 1.A.6.o, to develop a formal system, with individual treatment plans, to ensure access to routine and follow-up care for inmates with chronic illness, such as Plaintiff Wisniewski.

42.     Defendant CCS is required by its current contract to formulate working guidelines for the care of inmates with chronic non-cancer pain.

43.     Defendant CCS is required by its current contract to provide physical therapy and medical specialty care as needed.

44.     Defendant CCS is required by its current contract to develop a protocol to identify and manage inmate patients with serious pain while distinguishing them from patients who may simply be drug-seeking.  The first step mandated in that protocol is to reach agreement with the patient about the goals of

16

treatment.  The mandated protocol includes the use of NSAIDs, Acetaminophen, and Tramadol, as well as other interventions including opioids more potent than Tramadol.

45.    Defendant DOC itself, through its employees, is required by its current contract with CCS to develop pain management guidelines, with close collaboration between DOC's Bureau of Health Care Services and Defendant CCS, addressing the interventions contemplated by CCS's protocol for management of patients with serious chronic pain.

46.    Defendants DOC and CCS are required by their current contract to collect data on the medical management of inmates with chronic pain.  DOC and CCS are required to establish monthly monitoring of chronic pain management data and practices, both state wide and at the regional and facility levels.

47.    Defendant CCS is required by its current contract to provide several specific modes of training for inmates related to the management of chronic pain and to conduct informational outreach to community groups including the Pennsylvania Prison Society, which is specifically named.

48.    Defendant CCS is required by its current contract, incorporating DOC Policy 13.2.1, to develop, publish, and maintain a formulary of the most commonly prescribed and most cost effective medications to be used in the prisons of the DOC and to update the formulary every six months, and to make other medications

available through a non-formulary medication approval process approved by DOC. See Policy 13.2.1 § 12.B.

49.    Defendant DOC provides Defendant CCS with a financial incentive to decrease or eliminate prescriptions for NSAIDs and other over-the-counter medications.  Specifically, the current contract penalized CCS if it failed to reduce such prescriptions by 50% during the first year of the contract.

50.     The current contract between Defendants CCS and DOC includes several specific monetary incentives for Defendant CCS to reduce the number of days that inmates stay in hospitals or visit remote clinical sites, thereby reducing Defendant DOC's expense for correctional staff to escort the inmates outside the prison for medical treatment such as surgery or pain management while fostering the rationing of medical care without regard for inmate's actual medical needs.

51.    Defendants DOC and CCS are required by their current contract to establish a joint approach to cutting back on prescriptions for NSAIDs, which must nevertheless include a 30-day notice to the targeted patients.  The contract mandates an approach in which facility managers will announce this cut-back as if it were an initiative of the DOC rather than an initiative of CCS.

52.    Defendants DOC and CCS, in their current contract, anticipate and prepare for adversarial relations between themselves and inmate patients, in that CCS commits to provide DOC with several modes of litigation support, to

18

intervene in the processing of inmate grievances by interviewing inmates who file grievances, and to work with DOC staff to jointly develop standardized responses to grievances.

53.     Defendant CCS is required by its current contract to institute procedures to correct misconduct by its employees, including but not limited to deviations from CCS's contractual obligations.

**Plaintiff Wisniewski's Medical Needs**

54.     Plaintiff Thomas Wisniewski is a 59 year old man.  He is a disabled veteran who served in the U.S. Air Force in the mid 1970's.  During his military service,  Plaintiff Wisniewski sustained a debilitating injury to his back in 1976 when he fell twenty feet from a fuel tank.  He was determined to be partially disabled.  Upon honorable discharge, Wisniewski received and continues to receive disability payments.

55.     After leaving military service, Plaintiff Wisniewski worked for a time as a bricklayer.  He further injured his lumbar and cervical spine on the job.

56.     Unfortunately, Plaintiff Wisniewski became addicted to crack cocaine.  While under the influence of illicit drugs in May 2000, Plaintiff Wisniewski committed the murder for which he was sentenced to life in prison.

57.     Plaintiff Wisniewski overcame his drug addiction while in prison.  He has remained sober and free of illicit drugs since 2001.

58.     Both before and during his incarceration, Plaintiff Wisniewski received medical treatment for herniated discs in his cervical and lumbar spine. Despite surgeries in 1989 and 1994, the conditions continued to deteriorate, resulting in significant pain.  Subsequent to his incarceration, Plaintiff Wisniewski experienced partial paralysis of the left leg and difficulty walking because of "drop foot."

59.     As a state prisoner, Plaintiff Wisniewski has had no access to health care except for the medical treatment provided by Defendant DOC's contractors, such as Wexford and CCS.

60.     Prison medical records indicate that, in 2002, Wisniewski was under the care of a physician employed by Wexford, Abdulai Bukari, M.D.  Dr. Bukari sent Wisniewski to be evaluated by a neurologist, Albert W. Heck, M.D.  Dr. Heck performed nerve conduction studies and found "chronic and mildly active left L5 radiculopathy."  Later in 2002, Wexford physician Ronald A. Long, M.D., sent Wisneiwski to be examined by a neurosurgeon, Michael-Gerard Moncman, D.O. for "progressive atrophy distally in the left lower extremity and back pain."  Dr. Moncman recommended to Dr. Long:

> At this point, I do not believe that there is any hope of this man regaining his left lower extremity function.  I am suggesting to you that we treat him as a pain problem.  I would seek referral to the pain manager of your choice.  I have been acquainted with every pain manager in the area at one time or another and can offer no specifics.  I do not believe he requires injections.  I would suggest that this man likely needs implantable pain control techniques.

Dr. Long entered this finding into the prison medical records on November 6, 2002.

61.    Dr. Long was the medical director at SCI Smithfield and also served as Wexford's regional medical director.  Dr. Long prescribed medication to help Plaintiff Wisniewski manage the pain, including Acetaminophen (brand name "Tylenol") and Tramadol (brand name "Ultram").  The doses were adjusted until Wisniewski reported that he was able to tolerate the pain.

62.    Prison medical records show that Ultram together with Tylenol or an alternative NSAID were prescribed for Plaintiff Wisniewski continuously between 2001 and 2015 by the following providers, one after the other:

> Abdulai M. Bukari, M.D.
> Martin L. Lasky, D.O.
> Donald Bruaw, D.O.
> Ronald A. Long, M.D.
> Christina Doll, M.D.
> Olga Beregovskaya, M.D.
> John Kephart, D.O.
> Barry Eisenberg, D.O.
> Mary-Joy Wallace, M.D.
> Conrado F. Agra, M.D.
> Dawn Mills, P.A.
> Joshua C. Manute, C.R.N.P.

21

Ray McMullen, P.A.
Tyson Gillmen, P.A.

Prison medical records show that these providers periodically monitored Plaintiff Wisniewski for negative side effects of this medication regime and found none to be present.

63.     The records show no evidence of any abuse of pain medication by Plaintiff Wisniewski throughout all the years when it was prescribed for him.

64.     On November 18, 2013, Plaintiff Wisniewski underwent further testing by a neurologist, Mark E. Lipitz, D.O.  Dr. Lipitz detected "left L4-L5 radiculopathy" and "S1 radiculopathy," and he suggested a lumbosacral MRI. Those findings were entered into Wisniewski's prison medical records on December 2, 2013, by the Wexford medical director at SCI Smithfield, John Kephart, D.O.

65.     Dr. Kephart followed up by sending Plaintiff Wisniewski off site for an MRI at J.C. Blair Memorial Hospital in Huntingdon, PA, on February 4, 2014. The MRI report showed degenerative disc disease, "likely impingement of the left L5 nerve root," "impingement of the left S1 nerve root," with an impression of:

> Degenerative spondylosis from L2-3 through L5-S1 resulting in varying degrees of primarily lateral recess and neuroforaminal stenosis. . . .  Stenosis appears most significant at L4-5 and L5-S1 where there is severe left lateral recess stenosis at both levels. There is also moderate to advanced right neuroforaminal stenosis at L3-4.

22

66.     Dr. Kephart entered the MRI report into Plaintiff Wisniewski's

medical records at the prison on February 4, 2014.

67.     Dr. Kephart followed up by sending Plaintiff Wisniewski for further

evaluation at Allegheny Brain and Spine Surgeons in Altoona, which was a

neurosurgical subcontractor for Wexford.  There, he was evaluated by Matthew

Maserati, M.D. on March 28, 2014.

68.     Dr. Maserati reviewed the recent test results and examined Plaintiff

Wisniewski.  Dr. Maserati's assessment was:

> 1.  Lumbar disc herniation with radiculopathy
> 2.  Lumbosacral spondylosis without myelopathy
> 3.  Spinal stenosis of lumbar region
> 4.  Thoracic or lumbosacral neuritis or radiculitis, unspecified.
>
> Clinically appears symptomatic from low back pain with left leg
> pain.  Radiographically, there is evidence of disc protrusions L4-5
> and L5-S.  EMG's show left L4-5 radiculopathy.  I discussed at
> length the medical treatment options with their risks and benefits.
> Options include physical therapy, anti-inflammatories, muscle
> relaxers, injections vs. the surgical options to include left L4-5
> microdiscectomy (however it was discussed that this would likely
> not improve foot drop and goal of surgery would be to improve
> pain/numbness).
>
> At this time, it is reasonable to exhaust medical management.  I
> suggest that he be referred to pain management for possible
> injections.  He should return afterwards to be re-evaluated.

69.     Pending Plaintiff Wisniewski's return to Dr. Maserati for re-evaluation for surgery, Dr. Maserati recommended continuation of pain medications including Tramadol, over the counter NSAIDs, and Tylenol.

70.     Dr. Kephart entered these recommendations and options, including the option of physical therapy, into Plaintiff Wisniewski's prison medical record on March 31, 2014.

71.     Dr. Kephart discussed the options with Plaintiff Wisniewski on August 21, 2014, that is, shortly before Defendant CCS took over as the medical contractor for DOC on September 1, 2014.  At that time, Wisniewski had been taking Tramadol ("Ultram") continuously for many years, and he told Dr. Kephart that "his pain is adequately managed on current regimen" and did not report side effects or "progressive loss of function otherwise."  Wisniewski wanted more time to think about the recommendations of surgery or injections, as of August 21, 2014, and he agreed to try the other options first before returning for a follow-up appointment with Dr. Maserati.

72.     On August 25, 2014, Defendant Cutshall approved physical therapy for Plaintiff Wisniewski.

73.     Plaintiff Wisniewski had his next clinical visit with Dr. Kephart on October 2, 2014.  Wisniewski reported he was doing his exercises and that "things are pretty stable" with the pain medication and the physical therapy.  Dr. Kephart

reported no progression of symptoms since the last visit, so Wisniewski did not want to change the treatment.  Dr. Kephart's plan was to "continue current management."

74.     At that time, Plaintiff Wisniewski had been managing the pain of his deteriorating spine through medication for many years, under medical supervision by employees of Wexford and other contractors.  When medicated, his pain was significantly reduced and he was able to walk with the assistance of a cane.

75.     On September 1, 2014, Defendant CCS replaced Wexford as Defendant DOC's contractor for provision of health care services to inmates.  See Appendix at 4.

76.     The Wexford medical director at SCI Smithfield, Dr. Kephart, stayed on in the same position as an employee of Defendant CCS after the September 1, 2014, change of contracts.

77.     Dr. Kephart continued to prescribe Ultram for Wisniewski on a monthly basis through June 12, 2015, according to prison medical records.  The dosage was 400 mg. of Ultram, split up into three administrations throughout the day and taken under supervision of nursing staff.

78.     Another CCS physician, Conrado F. Arga, M.D., renewed the Ultram prescription on July 6, 2015, but he did not order a sufficient quantity of the

medication.  On July 15, 2015, yet another CCS physician, Mary-Joy Wallace, M.D., wrote another script for Ultram to make up the deficit.

### Harmful Policies, Practices, and Protocols

79.     Although the 2014-15 contract required Defendant CCS to provide inmates like Plaintiff Wisniewski with specialty services in pain medicine, physical therapy, and neurosurgery, and to provide timely follow-up on recommendations by medical specialists, CCS and its employees did not do so.  Instead, their practice was to delay or ignore the specialists' recommendations, or to deny specialty services altogether.

80.     Plaintiff Wisniewski had only one session with a physical therapist after Dr. Maserati recommended physical therapy for him, after which he had to do exercises on his own as best he could.

81.     "Pain medicine" was identified as a "specialty" according to Defendant DOC's earlier contract with Wexford.  Treatment by a pain-medicine specialist was to be provided by certain designated sub contactors who were named in Defendant DOC's contract with Wexford.  The designated providers for pain medicine for inmates at SCI Smithfield, in the Wexford contract, through August 31, 2014, are three:

> Allegheny Pain Management, in Altoona
>
> 810 Anesthesia, LLC, in Altoona

JC Blair Medical Services, in Huntingdon

82.     Subsequently, the 2014-15 contract between Defendant DOC and

Defendant CCS continued to define "pain medicine" as a "specialty," and it

required Defendant CCS to arrange for specialty treatment in pain medicine for

inmates at SCI Smithfield by one of the same three sub contractors:

> Allegheny Pain Management, in Altoona
> 810 Anesthesia, LLC, in Altoona
> JC Blair Medical Services, in Huntingdon

83.     Although the 2014-15 contract required Defendant CCS to refer an

inmate in Plaintiff Wisniewski's circumstances to one of these local specialists,

CCS and its employees did not do so.  Instead, CCS instructed or permitted Dr.

Kephart, a primary care physician, to continue to provide the pain medications as

he had done for many years previously.

84.     Although the 2014-15 contract required Defendant CCS to develop

and manage a formulary of medications and to collaboratively establish

pharmacotherapeutic procedures, and the current contract requires CCS to develop

and publish a formulary and to make non-formulary medications available by

request through a medication approval process, CCS and its employees have not

complied with these provisions.  Instead, as of July 30, 2015, CCS or its employees

27

announced a unilateral halt to pain medication and attributed this policy to a state-wide decision by Defendant DOC.

85.     Although the 2014-15 contract required Defendant DOC to collaborate with Defendant CCS to develop and manage a medication formulary and pharmacotherapeutic procedures, DOC and its employees did not do so. Instead, as of July 30, 2015, DOC or its employees either mandated or allowed, tolerated ,and acquiesced in a unilateral halt to pain medication.

86.     Defendants DOC and CCS did not develop any formulary for the provision of prescription medication for treatment of chronic pain, according to the declaration of Defendant Noel dated February 3, 2016.  Appendix at 18, 20-21. This failure in contract compliance is corroborated by the affidavit of Gustave A. Gabrielson dated January 28, 2016.  Appendix at 27.  It is further corroborated by the declaration of Richard S. Ellers dated February 4, 2016.  Appendix at 31.

87.     Although the 2014-15 contract required Defendant DOC's Chief of Clinical Services to provide for regular statewide, regional and local meetings to monitor the performance of Defendant CCS's employees in compliance with that contract, and Defendant Noel was Chief of Clinical Services, Dr. Noel did not provide for regular compliance reviews.  Instead, Dr. Noel followed a policy and practice of allowing Defendant CCS and its employees to deviate from their contractual obligations in the ways described herein.

28

88.     Plaintiff Wisniewski was injured by the Defendants' failure to implement supposedly helpful protocols, practices, and policies that were mandated by the 2014-15 contract, especially as they pertained to provision of medical management of chronic severe pain.

89.     Although Defendant CCS is required by the current contract to provide palliative care for inmates in Plaintiff Wisniewski's circumstances, to formulate working guidelines for pain care for such inmates, and to provide specialty care including physical therapy and surgery for inmates who need it, CCS and its employees have not provided such care for Wisniewski.

90.     Defendant CCS has not arranged for a specialist sub contractor to provide for treatment of chronic pain at SCI Smithfield, according to the declaration of Defendant Noel dated February 3, 2016.  Appendix at 18, 24-25. This failure in contract compliance is corroborated by the declaration of Richard S. Ellers dated February 4, 2016.  Appendix at 31-32.

91.     Although Defendants DOC and CCS are required by the current contract to collaboratively develop a protocol for managing serious chronic pain like that of Plaintiff Wisniewski, including but not limited to administration of Tramadol ("Ultram") and NSAID's; to institute monthly monitoring of that protocol at the state, regional, and local levels; to undertake educational programs on pain management for inmates, and to reach out with informational initiatives to

community organizations including the Pennsylvania Prison Society, these Defendants have not done any of those things.  Instead, CCS and its employees abruptly halted the Ultram and the NSAID that were prescribed for Plaintiff Wisniewski up until August 4, 2015, alleging that they were instructed to do so by DOC in a statewide policy.

92.     Defendants DOC and CCS have not developed any directives, guidelines, or regulations for treatment of chronic pain, according to the declaration of Defendant Noel dated February 3, 2016.  Appendix at 18-20, 23-24. This is failure in contract compliance is corroborated by the affidavit of Gustave A. Gabrielson dated January 28, 2016.  Appendix at 27.  It is further corroborated by the declaration of Richard S. Ellers dated February 4, 2016.  Appendix at 31.

93.     Although Defendant Dreibelbis, as CHCA at SCI Smithfield, was required by DOC policy to monitor the compliance of CCS and its employees with the provisions of the 2014-15 contract and the current contract, Defendant Dreibelbis did not do so.  Dreibelbis took no action to cause CCS staff at SCI Smithfield to provide chronic pain management, physical therapy, and a follow-up surgery consultation for Plaintiff Wisniewski after those treatments were recommended by the specialist, Dr. Maserati, and Dreibelbis was informed of the recommendations through Wisniewski's medical records, which Dreibelbis reviewed.

30

94.     Although Plaintiff Wisniewski himself appealed personally and directly to Defendant Dreibelbis and specifically asked him to prevent employees of CCS from halting the pain medication, Dreibelbis brushed him off and refused to intervene.

95.     Although Defendant Dreibelbis, as CHCA at SCI Smithfield, was required by DOC Policy 13.2.1 to arrange for annual assessments at a Veterans Administration hospital for Plaintiff Wisniewski, who is a disabled veteran, Dreibelbis did not do so.  Instead, Dreibelbis instituted and followed a policy of disregarding the need for monitoring of the progression of service-related disabilities of veterans like Wisniewski.

96.     Although Defendant CCS was required by DOC Policy 13.2.1 to arrange for annual assessments at a Veterans Administration hospital for Plaintiff Wisniewski, who is a disabled veteran, and to enter the results into his prison medical records, CCS did not do so.  Instead, CCS and its employees instituted and followed a policy of disregarding the need for monitoring of the progression of service-related disabilities of veterans like Wisniewski.

97.     Although Defendant Dreibelbis, as CHCA at SCI Smithfield, was required by DOC Policy 13.2.1 to develop a formal system for management of chronic illness, including an individual treatment plan and a means to ensure access to routine and follow-up care, for inmates with chronic severe pain like

31

Plaintiff Wisniewski, Driebelbis did not do so.  Instead, he instituted and followed a policy of disregarding chronic severe pain experienced by inmates like Wisniewski and ignoring the need to provide for and monitor treatment for chronic severe pain.  See DOC Policy 13.2.1 § 1.A.6.o.

98.    In their current contract, Defendant DOC and its employees wrongfully encourage Defendant CCS and its employees to reduce or eliminate prescriptions for certain pain-relief medications, including NSAIDs that are needed by Plaintiff Wisniewski, by providing a financial incentive for CCS to cut back on those medications, without medical necessity and in violation of recognized community standards of care.

99.    Upon information and belief, Defendants Oppman, Silva, Norris, Ginchereau, and Noel, singly or together, advocated to cause the incentive to reduce NSAID prescriptions to be included in the current contract, even though they knew that this incentive would decrease the quality of health care provided by CCS and its employees.

100.    In their current contract, Defendant DOC and its employees wrongfully offer monetary incentives for Defendant CCS to reduce the number of days that inmates stay in hospitals or visit remote clinical sites, with the effect of depriving inmate patients like Plaintiff Wisniewski of needed off-site specialist care.

101.   Upon information and belief, Defendants Oppman, Silva, Norris, Ginchereau, and Noel, singly or together, advocated to cause he current contract to include monetary incentives to reduce off-site medical specialty visits, even though they knew that this incentive would decrease the quality of health care provided to inmates like Plaintiff Wisniewski by CCS and its employees.

102.   In their current contract, Defendant DOC and its employees wrongfully encourage Defendant CCS and its employees to cultivate an adversarial relationship with inmate patients, or tolerate and acquiesce in that adversarial relationship, by promising to provide litigation assistance to DOC and its employees against the inmate patients and by planning to intervene on behalf of DOC and its employees when inmate patients file grievances.

103.   Upon information and belief, Defendants Oppman, Silva, Norris, Ginchereau, and Noel, singly or together, advocated to cause the inclusion in the clauses in the current contract that set up an adversarial relationship between inmate patients and their health care providers, to the detriment of patient care and the deterioration of the doctor-patient relationship for inmates like Plaintiff Wisniewski.

104.   Plaintiff Wisniewski has been injured by the harmful policies and practices that are incorporated into the current contract, as well as by the Defendants' failures to implement supposedly helpful protocols, practices, and

33

policies that are mandated by the current contract, especially as they pertain to administration of pain medication.

## Refusal of Treatment for Deteriorating Spine

105.   Plaintiff Wisniewski did not receive any of the treatments that the specialist, Dr. Maserati, had recommended in early 2014 for the pain and numbness in his back and legs, except for continuation of the two longstanding prescriptions for pain medications, Ultram and Motrin, and one session with a physical therapist who demonstrated exercises for Wisniewski to do on his own.

106.   Wexford did not provide physical therapy, injections, consultation with a pain management specialist, or surgery for Wisniewski during the five months between the time of the recommendation of the neurosurgeon, Dr. Maserati, in March 2014 and the termination of Wexford's contract on August 31, 2014.  However, the initial less invasive options were followed during that time in anticipation of the return visit to the neurosurgeon, Dr. Maserati.

107.   After CCS assumed contractual obligations for Plaintiff Wisniewski's health care on September 1, 2014, Defendant CCS and its employees failed to provide physical therapy, injections, consultation with a pain management specialist, or surgery for Plaintiff Wisniewski, and they failed to take him back to Dr. Maserati for the follow-up appointment.

108.   Dr. Kephart is not a specialist in treatment of chronic pain.  Neither Dr. Agra nor Dr. Wallace is a specialist in treatment of chronic pain.

109.   Defendant Cutshall refused to schedule Plaintiff Wisniewski to be seen by an off-site specialty care provider for pain management, although this treatment was recommended the specialist, Dr. Maserati, and was noted in Plaintiff Wisniewski's medical records, and Cutshall failed to arrange the follow-up appointment with the neurosurgeon, Dr. Maserati.

110.   Defendant CCS and its employees Dancha, Frommer, and Cutshall pursued policies and practices designed to evade their contractual obligations and to deny medical treatment for Plaintiff Wisniewski's serious medical needs, including but not limited to a policy of halting medication for chronic pain and a policy of delaying and discouraging surgery and denying it outright.

111.   Defendants who are employees of DOC, that is, Dreibelbis at SCI Smithfield and Noel, Ginchereau, Montag, White, Norris, Silva, and Oppman at the DOC central office, pursued their own policies and practices of interfering with palliative care and other care that Plaintiff Wisniewski needed.

112.   After CCS took over as Defendant DOC's inmate health-care contractor on September 1, 2014, Plaintiff Wisniewski continued to follow the initial noninvasive program of medication and exercise recommended by neurosurgeon Maserati, as best he could without access to a chronic pain clinic or a

35

specialist in chronic pain management, in anticipation of a follow-up visit at an appropriate time.

113.   CCS and its physicians, including Defendant Frommer, were obliged by contract to provide treatment for Plaintiff Wisniewski's serious medical needs, including his severe chronic pain and partial paralysis, but they refused to provide such treatment, although Defendant Frommer was well aware of Plaintiff Wisniewski's condition and medical needs.

114.   As of August 4, 2015, Defendant CCS and its physicians at SCI Smithfield refused to continue the initial noninvasive medical regimen recommended for Plaintiff Wisniewski by Dr. Maserati.  Together with Defendant Cutshall, CCS's lay administrative employee, Defendants Frommer and Dancha refused to arrange for Defendant Wisniewski to undergo the recommended follow-up with the neurosurgeon.

115.   Having halted the program recommended by Dr. Maserati, the CCS employees put no other treatment plan in its place.  They allowed Plaintiff Wisniewski to suffer with no medical relief at all.  After several weeks, Wisniewski was able to purchase a small quantity of Tylenol in the prison commissary, but it did not reduce the pain to a level that permitted him to walk around as he had done before.

116.   Defendant DOC's employees either tolerated or acquiesced in and encouraged the Defendant CCS's policy and practice of halting medication for chronic pain.

117.   Defendant DOC's employees, including Defendant Dreibelbis at SCI Smithfield and Defendants Noel, Ginchereau, Montag, White, Norris, Silva, and Oppman at the Defendant DOC central office, knowingly failed to fulfill their oversight responsibilities to ensure that Defendant CCS complied with the contract as to the pain management, surgery, and other treatment that Plaintiff Wisniewski needed.  Defendant Dreibelbis knew of Plaintiff Wisniewski's medical needs because Dreibelbis managed the medical records and because Wisniewski personally spoke with Dreibelbis in the summer of 2015 about the medications and other treatment required.  Defendants Montag and White, in their jobs as Medical Contract Monitors, saw evidence of CCS's non-compliance at prisons including SCI Smithfield, where Wisniewski was housed, yet Montag and White failed to take steps to bring CCS into compliance.  Defendant Noel, as Chief of Clinical Services, failed to fulfill his contractual responsibility to provide for periodic compliance reviews at state, regional, and local levels.  On information and belief, Defendants Noel, Ginchereau, Norris, Silva, and Oppman failed to participate on various committees that were supposed to establish the treatment protocols specified in the current contract, including but not limited to the protocol for

management of chronic pain and the establishment of the medication formulary and the pharmacotherapeutic procedures.

118.   Instead of performing their respective oversight duties or their respective duties to formulate treatment protocols and procedures, Defendants Oppman, Silva, Norris, Ginchereau, Noel, and Dreibelbis knowingly acquiesced in or encouraged practices by CCS and its employees that breached the contract, fell below community standards of care, exhibited deliberate indifference to Plaintiff Wisniewski's serious medical need, and inflicted cruel punishment on him by unnecessarily prolonging his pain and loss of mobility.

119.   The health care provided to Plaintiff Wisniewski by Defendants fell short of the accepted standard for health care in the community, and continues to fall short.   At all relevant times, Defendants were willful participants in joint activity with a state entity, the Department of Corrections (DOC), and acted under color of state law by demonstrating deliberate indifference to these non-delegable duties, in violation of the Eighth Amendment.

### Abrupt Halt to Medication

120.   Between September 2014 and June 2015, although the treatment recommended by Dr. Maserati, the specialist, was withheld, Dr. Kephart continued to monitor and prescribe chronic pain medications that Plaintiff Wisniewski had

been taking for many years, Ultram and high-dose Motrin or other NSAID.  Drs.

Agra and Wallace continued the Ultram prescription through July 2015.

121.   Defendant Frommer was hired by CCS in late July 2015.  Frommer

replaced Kephart as medical director at SCI Smithfield, hence Frommer became

Plaintiff Wisniewski's principal treating physician.

122.   On July 30, 2015, Plaintiff Wisniewski went to sick call at the prison

and requested renewal of the Ultram prescription, which was the typical method

that he routinely used to request prescription renewal, as needed.

123.   Medical records indicate that, during the July 30, 2015 clinical

encounter, Plaintiff Wisniewski was advised by Mary Ellen Torney, a nurse

practitioner, "that the D.O.C. is cutting back on Ultram and may not be renewed."

Ms. Tormey also noted, "Motrin will be renewed for two weeks" and "[patient]

will be on chart review for M.D. for Ultram."

124.   There was no such directive from Defendant DOC pertaining to

"cutting back on" Ultram or any similar medication, according to the affidavit of

Defendant Noel executed on February 3, 2016 that was provided to Plaintiff's

counsel in response to a request pursuant to Pennsylvania's Right-to-Know Law.

Appendix at 17-20.

125.   Upon information and belief, Defendant Frommer or Defendant

Dancha informed Nurse Practitioner Mary Ellen Tormey and other staff in the

medical department at SCI Smithfield that Defendant DOC had ordered them to discontinue Ultram prescriptions.  An entry by Ms. Tormey in Plaintiff Wisniewski's prison medical records dated July 30, 2015 indicates that such a policy was informally and unilaterally instituted by DOC without any documented directive.

126.   Defendant CCS failed to fulfill its contractual obligation to collaborate with DOC to jointly develop guidelines for treatment of chronic pain.

127.   Defendant DOC failed to fulfill its contractual obligation to collaborate with CCS to jointly develop guidelines for treatment of chronic pain.

128.   Instead of developing appropriate treatment protocols for chronic pain, CCS and its employees, including Defendants Frommer, Dancha, and Cutshall, upon information and belief, followed a policy and practice of abruptly and blindly halting pain medication for some prisoners during and after 2015, without a legitimate medical basis, exhibiting deliberate indifference to Plaintiff's serious medical needs.

129.   Upon information and belief, Defendant DOC's employees with oversight responsibility, as described above, including Defendants Dreibelbis, Noel, Ginchereau, Montag, White, Norris, Silva, and Oppman, either actively instructed Defendant CCS to implement the policy of automatically halting pain

medication, or knew of, acquiesced in, and encouraged that policy, exhibiting deliberate indifference to Plaintiff's serious medical needs.

130.   The policy and practice of abruptly halting pain medication without first ascertaining medical need, whether that policy and practice originated with DOC employees or with CCS employees or both, was applied to Plaintiff Wisniewski by Defendant Frommer or Defendant Dancha in a deliberate attempt to deny Wisniewski his medication and thereby to subject him to the return of the kind of debilitating pain that was well documented in his medical records.

131.   Defendant Dancha, as supervisor for Defendant Frommer, either instructed Frommer to halt prescriptions for Ultram on the pretext or in the knowledge that Defendant DOC had ordered such a halt, or knew of, acquiesced in, approved and encouraged Frommer's discontinuation of Ultram prescriptions and the unsubstantiated information imparted to staff about a purported DOC policy, exhibiting deliberate indifference to Plaintiff's serious medical needs.

132.   On August 4, 2015, Defendant Frommer had his first clinical encounter with Plaintiff Wisniewski.  At that time, without legitimate medical basis, Frommer told Wisniewski that Frommer would not renew the two pain prescriptions, exhibiting deliberate indifference to Plaintiff's serious medical needs.

133.   The medications were discontinued abruptly.  The Ultram was not tapered off.  Defendant Frommer told Plaintiff Wisniewski to buy Motrin in the prison commissary, but Motrin is not available in commissary at the strength prescribed for Plaintiff Wisniewski, while Frommer made no effort to check to see if it was available, exhibiting deliberate indifference to Plaintiff's serious medical needs.

134.   Defendant Frommer reviewed Plaintiff Wisniewski's medical chart, such that Frommer knew that Wisniewski experienced chronic pain at significant levels and that Plaintiff Wisniewski had only a two-week supply of Motrin as of July 30, 2015, yet Defendant Frommer did not renew the prescription for high-dose Motrin , exhibiting deliberate indifference to Plaintiff's serious medical needs.

135.   Defendant Frommer intentionally did not prescribe any alternative treatment for Wisniewski's pain and numbness, exhibiting deliberate indifference to Plaintiff's serious medical needs.

136.   Subsequent to being arbitrarily deprived of his accustomed medication, Plaintiff Wisniewski suddenly experienced extreme discomfort because of the withdrawal.  He also began to experience increasingly sharp pain in his neck and back, radiating out into the left arm and left leg.  The pain made it difficult to sleep and to walk.

137.   Withdrawal symptoms consequent to abrupt cessation of Ultram are well known to physicians like Defendants Frommer and Dancha.  Warnings are provided by the manufacturer at several web sites including  http://www. accessdata.fda.gov/drugsatfda_docs/label/2009/020281s032s033lbl.pdf.

138.   As his mobility decreased and his function deteriorated, Plaintiff Wisniewski was deprived of access to a number of activities and services at the prison that he formerly participated in.

139.   There was no legitimate medical reason to discontinue these longstanding prescriptions for Ultram and Motrin, and doing so displayed deliberate indifference to Plaintiff Wisniewski serious medical needs

140.   Abrupt discontinuation of Ultram is contrary to accepted practices in medicine and is known to be harmful, as specifically stated in the Prescribing Information for Ultram located on the FDA's website,  http://www. accessdata.fda.gov/drugsatfda_docs/label/2009/020281s032s033lbl.pdf.

141.   Defendant Frommer's abrupt discontinuation of Plaintiff Wisniewski's pain medications, failure to institute any other treatment for Plaintiff's chronic pain and paralysis, and refusal to schedule the recommended follow-up appointment with the neurosurgeon all displayed deliberate indifference to Plaintiff's serious medical needs.

142.   Defendant DOC's employees with oversight responsibility for Defendant Frommer's compliance with the contract between DOC and CCS, including Defendants Dreibelbis, Noel, Ginchereau, Monag, White, Norris, Silva, and Oppman, failed to monitor Frommer's actions, and additionally tolerated or acquiesced in and encouraged Frommer's denial of medical care to Plaintiff Wisniewski with deliberate indifference to Plaintiff's serious medical needs.

143.   Defendant DOC and its employees knew that DOC's contractors were refusing to provide proper medical care to Plaintiff Wisniewski.  Either Defendant CCS, or employees of DOC itself, set a new blanket policy, with full knowledge that certain prisoners, including those with medical needs like those of Plaintiff Wisniewski, would be harmed by this policy, or by arbitrarily denying access to pain medicine in the absence of any formal policy at all, with deliberate indifference to Plaintiff.  DOC and its employees were aware or reasonably should have been aware that prisoners who dealt with severe chronic pain would be physically harmed by abrupt discontinuation and denial, whether arbitrarily or as part of a formal blanket policy that ignored individual needs.

## Defiance of Injunction

144.   Plaintiff's counsel initially filed this action in state court to obtain a preliminary injunction to require Defendant CCS to resume Plaintiff's pain medication.

145.   The court issued an injunction on August 21, 2015.  <u>See</u> injunction, doc. 2-1.

146.   The Order of August 21, 2015 enjoins Defendants Frommer, Dancha, and DOC

> from refusing to provide the Plaintiff in this action the two non-opioid medications that he has been receiving since 2003.  More specifically, IT IS THE ORDER OF THIS COURT that until further Order the Plaintiff is to receive Motrin and Tramadol in the same dosages that he had been receiving prior to discontinuation on August 4, 2015.

That dosage was 800 mg. of Motrin (Ibuprophen) daily and 400 mg. of Tramadol ("Ultram") daily in three administrations spaced out throughout the day.  <u>See</u> record of dosage,  doc. 18-1 (sealed).

147.   Notice of this injunction was immediately delivered to Defendant Cutshall, but she refused to comply with the injunction for several days and she declined to communicate its terms to Defendants Frommer and Dancha, with deliberate indifference to Plaintiff's serious medical needs.

148.    Several days later, Defendants Dancha and Frommer restored part of Plaintiff Wisniewski's prior dose of Ultram for a brief period.

149.   Defendants CCS, Dancha, and Frommer soon moved to dissolve the injunction after this brief period of partial compliance, and the state court did so by its Order of September 1, 2015.

150.   After September 1, 2015, Defendant CCS's employees provided
Plaintiff Wisniewski no treatment for his deteriorating spine except Motrin.

151.   Motrin alone falls short of the accepted standard for treatment of
chronic back pain, when the option of surgery is available and offers the prospect
of reducing or eliminating the pain, and when a previously effective medication,
Ultram, is available for maintenance until surgery can be scheduled.  The current
contract between DOC and CCS provides that Tramadol ("Ultram") is to be
administered for treatment of chronic pain.

152.   On June 16, 2016, the Superior Court of Pennsylvania vacated the
September 1, 2015 Order, effectively reviving the injunction of August 21, 2015.
The appellate court remanded the defendants' motion to the state trial court for
further proceedings.

153.   On or about June 18, 2016, Defendant CCS's employee Defendant
Frommer prescribed Ultram for Plaintiff Wisniewski again, but he did so at a
dosage of only 100 mg. per day, which is one-fourth the level previously
prescribed for Wisniewski and required by the reinstated injunction, that is, 400
mg. per day distributed among three administration times.

154.   Ultram has no therapeutic effect at this drastically reduced dosage
according to the Prescribing Information for Ultram, which states that the
recommended daily dosage for moderate to severe pain is ordinarily between 200

46

mg and 400 mg., according to the manufacturer's specifications at  http://www.

accessdata.fda.gov/drugsatfda_docs/label/2009/020281s032s033lbl.pdf.  This

decreased dosage does little, if anything, to reduce Wisniewski's pain, and it does

not restore his mobility and function.

155.   According to the manufacturer's prescribing information for Ultram,

"concerns about abuse, addiction, and diversion should not prevent the proper

management of pain. The development of addiction to opioid analgesics in

properly managed patients with pain has been reported to be rare."

156.   Defendant CCS, through its employee Defendant Frommer, provided

Plaintiff Wisniewski with the one-quarter dose of Ultram, that is, 100 mg. per day,

between June 18 and August 18, 2016.

157.   On August 18, 2016, Defendant DOC moved Plaintiff Wisniewski

from SCI Smithfield to SCI Camp Hill so that he could attend a hearing in this

matter in the courthouse in Harrisburg.

158.   Defendant Dancha is the supervisor of CCS medical staff at SCI

Camp Hill.

159.   Defendant Dancha continued to impose CCS's policy of denying pain

medication for Plaintiff Wisniewski's chronic pain at SCI Camp Hill, just as at SCI

Smithfield.

160.   Under Defendant Dancha's supervision, employees of Defendant CCS initially refused to administer any Ultram to Plaintiff Wisniewski for the first few days at SCI Camp Hill.  Thereafter, they administered it sporadically and at no more than one-fourth of the prior dose, that is, no more than 100 mg. per day.

161.   Defendants CCS's and DOC's employees at SCI Camp Hill refused to provide Ultram at the regular prison pill line unless Plaintiff Wisniewski submitted a special request each day in a manner that was needlessly oppressive to him. They required Plaintiff Wisniewski to request the Ultram each day at 4:00 a.m. or else it would not be brought to his housing block for distribution on the regular pill line.  Wisniewski stayed awake until 4 a.m. whenever he was able to do so, but he missed many doses because he was unable to submit the required daily request in the manner imposed.

162.   On some days when the Ultram was not brought to the housing block for the regular pill line, DOC staff caused Wisniewski to walk a long and painful distance to the medical department to receive the Ultram there, despite his disability and limited mobility.

163.   Plaintiff Wisniewski continued to experience debilitating pain and loss of mobility at SCI Camp Hill, where Defendant CCS's employees continued to evade their contractual obligations, and DOC employees continue to tolerate,

48

encourage, and acquiesce in the denial of medical care, displaying deliberate indifference to Plaintiff's serious medical needs.

164.   Defendant DOC returned Plaintiff Wisniewski to SCI Smithfield on September 8, 2016, where he currently remains.

**Deliberate Indifference to Plaintiff's Serious Medical Needs
And Other Wrongful Intent**

165.   CCS and its employees continue to refuse to provide Plaintiff Wisniewski with any of the treatment options recommended by Dr. Maserati: specialist pain management, regular physical therapy, injections, and the follow-up appointment with the neurosurgeon for re-evaluation of the chronic severe pain.

166.   Defendant DOC and its employees continue to fail to monitor compliance with the CCS health care contract, with the result that they acquiesce in and encourage CCS policies that deny Wisniewski the treatment that he needs for his medical condition.

167.   Defendants CCS's and DOC's employees were and continue to be well aware of the extensive documentation of Plaintiff Wisniewski's medical condition in prison medical records since 2001 and of the treatments recommended for him by the neurosurgical specialist in 2014.

168.   Defendants, either singly or in combination, wrongfully denied Wisniewski the medical treatment that he needed, with the intent of making CCS

eligible to receive certain bonuses that the contract awards to CCS when costs for outside medical escorts are reduced.

169.   Defendants Frommer, Dancha, and Cutshall had no legitimate medical reason to deny pain medication and  surgery to Plaintiff Wisniewski, as they repeatedly did.  According to the prescribing information for Ultram, "concerns about abuse, addiction, and diversion should not prevent the proper management of pain. The development of addiction to opioid analgesics in properly managed patients with pain has been reported to be rare."

170.   Upon information and belief, Defendant Frommer continued to prescribe Ultram to certain inmates at SCI Smithfield who sold the medication to other inmates, thereby creating a "black market."  Upon information and belief Defendant Frommer continued to write prescriptions for Ultram through June 2016 to inmates other than Wisniewski.  Further details and documentation of this preferential prescription to certain favored inmates, but not to Plaintiff Wisniewski or others in legitimate need, await further discovery.

171.   Upon information and belief, Defendants Frommer and Dancha stood to reap financial gain or other advantages from fostering the black market in pain medication within the prison, in a ways that await discovery.  In halting the pain medication of Plaintiff Wisniewski, they chose to advance their own personal interests with deliberate indifference to Wisniewski's serious medical need.

50

172.   Upon information and belief, the informal DOC policy of refusing to provide Ultram was enforced by CCS employees against Plaintiff Wisniewski, but was not addressed uniformly to all inmates, which exhibits deliberate indifference to Plaintiff's serious medical needs by targeting Plaintiff with this policy.

173.   On information and belief, Defendant Frommer or Defendant Dancha, either singly or in cooperation, continued to order Ultram for the prison, thereby bringing quantities of it into SCI Smithfield where it became subject to black-market trafficking by inmates and staff.  Further details and documentation await discovery.

174.   The abrupt halt to Ultram prescriptions for Plaintiff Wisniewski and some other inmates during 2015 had the effect of creating demand for illicit Ultram, which is believed to be available in the black market among inmates and staff at SCI Smithfield, and for other contraband drugs.

175.   Trafficking in illicit drugs, including prescription drugs wrongfully obtained, is a serious concern in Pennsylvania prisons because it "introduces other types of contraband into institutions including, weapons, money and cell phones, and engenders security threat group activity and violence, bartering and trading of contraband products, and other violations of institutional security rules," according to the declaration of Defendant Noel dated February 3, 2016.  Appendix at 22.

176.   On information and belief, Plaintiff Wisniewski and other inmates and staff at SCI Smithfield are endangered by the black market traffic in Ultram and other pain-reducing drugs because Defendants Frommer and Dancha wrongfully manipulate their availability.

177.   Conduct of Defendants as described above displas deliberate indifference to Plaintiff's serious medical needs and deliberate indifference to the grave risk of violence created when a black market in prescription pain medication is fostered by selectively halting prescriptions for some prisoners but not all prisoners.

178.   Defendant CCS hired Defendant Dancha as a regional director and placed him in a position where he could manipulate the availability of drugs like Ultram at SCI Smithfield, even though CCS knew that Dancha had been convicted of federal drug crimes for facilitating the wrongful handling and fraudulent marketing of medication, that Dancha had served time in federal prison for those offenses, and that he was still paying one thousand dollars a month toward a court-ordered forfeiture of six hundred thousand dollars ($600,000.00).

179.   Defendant CCS's contract with Defendant DOC contains "Contractor Integrity Provisions" with specific assurances that no CCS "director" or "employee . . . associated with . . . performing a public contract" has been convicted of any "crime involving moral turpitude or business dishonesty or integrity."

52

180.   Violation of the "Contractor Integrity Provisions" by Defendant CCS enabled Defendant Dancha to use his position as a CCS regional director to divert pain medications away from Plaintiff Wisniewski and other inmates who needed it and to either conduct or foster and tolerate illicit traffic in those medications at SCI Smithfield.

181.   Defendant CCS further fostered the dangerous black market in pain-relief drugs at SCI Smithfield by failing to provide an on-site pain management clinic or to refer inmates to off-site clinics with board-certified specialists, as the contract requires.

182.   Defendant DOC's employees with oversight responsibility, including Defendants Dreibelbis, Noel, Ginchereau, Montag, White, Norris, Silva, and Oppman, failed to monitor and enforce compliance with the contracts between Defendants DOC and CCS as to medical management of chronic pain, because they either tolerated or acquiesced in and encouraged the irregular policies of the medical contractor, CCS, without due vigilance to discourage conditions in which a black market in contraband pain medication could develop and thrive.

### Inferior or Nonexistent Medical Care

183.   Defendants CCS, Frommer, and Dancha undertook to provide medical care for Wisniewski under the terms of their contracts with Defendant DOC for

health services for inmates, but their policy and custom was to provide the absolute minimum of care so as to maximize profits for Defendant CCS.

184.    Defendants CCS, Frommer, and Dancha provided little or no care for Plaintiff Wisniewski's chronic severe pain, which is a serious medical condition requiring treatment.

185.    Defendants CCS, Frommer, and Dancha provided little or no care for Wisniewski's deteriorating spine and loss of mobility, which are serious medical conditions requiring treatment.

186.    The abrupt halt to the Ultram prescription on August 4, 2015, and the failure to replace it with any other appropriate treatment for chronic back pain, constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution as well as failures to meet accepted community standards of medical care.  These actions violate Section 1983 by displaying deliberate indifference to Plaintiff's serious medical needs.

187.    The limited resumption of Ultram at sub-therapeutic dosages for a few days in August 2015 and again for several weeks after June 18, 2016, and failure to administer the proper dosages at all relevant and necessary times, constitutes cruel and unusual punishment under the Eighth Amendment as well as a failure to meet accepted community standards of medical care.  These actions violate Section 1983 by displaying deliberate indifference to Plaintiff's serious medical needs.

188.   Denial of follow-up consultation for surgical intervention that was recommended to relieve pinched nerves in the spine constituted cruel and unusual punishment under the Eighth Amendment as well as a failure to meet accepted community standards of medical care.  This action violates Section 1983 by displaying deliberate indifference to Plaintiff's serious medical needs.

189.   Denial of adequate physical therapy, including but not limited to pain medication to permit motion during therapy, constituted cruel and unusual punishment under the Eighth Amendment, as well as a failure to meet accepted community standards of medical care.  These actions violate Section 1983 by displaying deliberate indifference to Plaintiff's serious medical needs.

190.   Defendant CCS, through its policies and practices, and Defendants Frommer, and Dancha, through their own actions, exhibited deliberate indifference to Wisniewski's serious medical need.

191.   Defendants Noel and Ginchereau are licensed medical doctors who supervise the medical care provided by Defendants Frommer and Dancha, also physicians.  All of these physicians failed to provide an acceptable level of care for Plaintiff Wisniewski.

192.   Defendants Dreibelbis, Norris, and Silva are licensed registered nurses who supervise provision of health care services by Defendant CCS and CCS's employees, including Defendant Dr. Dancha, Defendant Dr. Frommer, and

administrative aspects of health care provision by Defendant Cutshall, who does not hold a professional license. Defendants Norris and Silva also supervised the monitoring of the health care contracts by Defendants Montag and White, who do not hold professional licenses. Nurses Dreibelbis, Norris, and Silva failed to provide an acceptable level of care for Plaintiff Wisniewski.

193.    Defendant DOC's employees failed to require contract compliance, but instead, they tolerated, acquiesced in, and encouraged Defendant CCS and its employees to flout contractual requirements so as to maximize revenue and reap incentives built into the contracts.

## Injuries to Plaintiff

194.    Plaintiff Wisniewski experiences excruciating pain from the pinched nerves in his lower spine. The pain could have been alleviated several years ago had Plaintiff been provided with the progressive medical interventions and the eventual follow-up visit with the neurosurgeon that were recommended at his initial consultation with the neurosurgeon in March 2014.

195.    Since August 2015, Plaintiff Wisniewski experienced the full force of the devastating pain because he was deprived of even the partial relief afforded by Ultram before Defendants halted that medication.

196.    Plaintiff Wisniewski has lost mobility and function because the pain makes it difficult for him to walk and climb stairs at the prison.

197.   Plaintiff Wisniewski has lost access to recreation outdoors because he cannot ambulate without extreme pain and difficulty.

198.   Because he can walk only with great difficulty, Plaintiff Wisniewski's access to prison facilities such as the library, the chapel, and common activities areas is greatly curtailed.

199.   At age 59, Plaintiff Wisniewski is unlikely to regain the muscle tone and agility that he lost during the time period where unnecessary pain kept him from walking around and getting normal exercise a he formerly did.  The deficit in function is practically permanent, even if surgery alleviates the pain in future.

200.   Back pain disturbs Plaintiff Wisniewski's sleep on most nights, and he is in a continual state of fatigue during the day.

201.   The risk of assault and intimidation for prisoners like Plaintiff Wisniewski has increased because of Defendants' manipulation of prescriptions for pain medication and the consequent rise of illicit trafficking.

202.   Plaintiff Wisniewski has experienced emotional distress upon recognizing that physicians to whom his care is entrusted, Defendants Frommer and Dancha, have acted in a manner that harms him instead of trying to heal him.

**C**AUSES OF **A**CTION

**Count I**

**Violation of Article I, Section 13 of the Declaration of Rights
Of the Constitution of the Commonwealth of Pennsylvania**

**(All Defendants)**

203.   Paragraphs 1 through 202 are included here by reference.

204.   Defendant CCS and its employees Defendants Frommer, Dancha, and Cutshall inflicted cruel punishment on Plaintiff through their deliberate indifference to serious medical needs by denying Plaintiff appropriate medical treatment to relieve severe impingement of the nerves of the spine and to reduce the pain caused thereby for more than two years, while Plaintiff was a state prisoner with no access to medical treatment except the treatment under Defendants' control as contractors for the Department of Corrections, an agency of the Commonwealth, acting on its behalf by performing non-delegable duties of the Commonwealth's agency.  These Defendants acted under the color of state law by acting in concert with the Commonwealth by exhibiting deliberate indifference to Plaintiff's serious medical need.

205.   The Commonwealth has a non-delegable duty to provide appropriate medical treatment recommended by physician specialists, but the Defendants instead displayed deliberate indifference to Plaintiff's serious medical needs by

58

willfully ignoring these recommendations and failing to treat Plaintiff's medical condition, and by willfully failing to provide necessary and legitimate medication to alleviate his ongoing and debilitating pain.

206.   Defendants Dreibelbis, Noel, Grinchereau, Montag, White, Norris, Silva, Oppman, and DOC inflicted cruel punishment on Plaintiff both through policies, practices, and protocols that they developed in cooperation with Defendant DOC under the contract between CCS and DOC and through their acquiescence in practices and policies followed by CCS that were contrary to contractual terms that the DOC employees were required to monitor and enforce for the sake of Plaintiff's appropriate medical care.

207.   Among the many policies, practices, and protocols required by the contracts between CCS and DOC that CCS failed to provide, and that DOC employees failed to enforce are:

- provision of palliative care;
- provision of a chronic care clinic for pain management;
- provision of specialty medical services including care by specialists in pain medicine, physical therapy, and neurosurgery;
- development of a pain medicine protocol and pain management guidelines;
- development of a formulary and pharmacotherapeutic practices for provision of pain medication along with procedures for requesting non-formulary medication;

59

- protocols for follow-up on the recommendations of specialists including return visits;

- training in pain management for inmates living with chronic pain; and

- provision for annual monitoring of disabled veterans at a Veterans Administration hospital.

208.   Among the policies, practices, and protocols instituted in the contracts between CCS and DOC that directly inflict cruel punishment and foster deliberate indifference to patient wellbeing are:

- the financial incentive for CCS to reduce or eliminate prescriptions for NSAIDs without medical need to cut back on the NSAIDs;

- the financial incentive for CCS to reduce or eliminate visits to hospitals and to medical specialists outside the prison regardless of medical needs for such visits;

- subversion of therapeutic relationships by fostering an adversarial stance between CCS health care providers and their inmate patients by encouraging litigation, providing several modes of litigation assistance;  and

- engendering discord between CCS health care providers and their inmate patients by assisting DOC staff to resist grievances by having CCS health care staff personally confronting inmates in the context of grievance reviews.

209.   Among the policies, practices, and protocols that inflict cruel punishment but are not imposed by the contracts are:

- the use of primary care physicians instead of specialists to treat chronic severe pain;

- the abrupt halt of Tramadol and other pain medication, whether on the instructions of DOC, the instructions of CCS, or the initiative of one or more of their employees;

- the practice of denying inmate patients the follow-up visits recommended by specialty medical providers;

- the practice of postponing indefinitely the performance reviews and "quality control meetings" that are mandated by contract and by DOC policy at regular intervals at the state, regional, and local level; and

- the policy of non-enforcement of specific contract provisions as described herein.

210.   Defendants' denial of medical treatment to Plaintiff  and the flouting of the terms of the health care contracts has no rational relation to any legitimate state interest or correctional purpose.

211.   As a result of the cruel punishment inflicted by Defendants, Plaintiff sustained the injuries described herein and will experience irreparable harm unless the Court awards injunctive relief as requested, and further may continue to experience permanent injuries due to the prolonged denial of appropriate medical treatment.

212.   This Honorable Court may grant the equitable relief available under 42 Pa.C.S. § 6604 and 18 U.S.C. § 3626 and may enjoin the defendants to cease the cruel punishment, resume administration of pain medication at the prior dosage, and cause Plaintiff to receive medically necessary treatment from Defendant CCS's neurosurgical subcontractor or other medical subcontractors.

**Count II**

**Claims under 42 U.S.C. §§1983 and 1988**
**For Violation of Eighth Amendment Rights**
**Through Deliberate Indifference to Serious Medical Need**
**(All Defendants Except DOC)**

213.   Paragraphs 1 through 202 are included here by reference.

214.   Defendant Correct Care Solutions, LLC, through its employees Frommer, Dancha, Cutshall, and others, pursued a practice and policy of abruptly halting the prescription of medication for chronic pain for inmates, including Plaintiff, without legitimate medical reason.

215.   Defendants Frommer and Dancha, while acting under color of state law, further refused to provide Plaintiff Wisniewski with surgery or any other treatment for a serious medical condition, that is, deterioration of the spine and impingement of nerves in his back.

216.   Defendant Cutshall, while acting under color of state law, refused to arrange off-site specialty medical care for Plaintiff, refused to obey the injunction of August 21, 2015, and refused to communicate its contents to Frommer and Dancha, and she did so with deliberate indifference to Plaintiff's serious medical needs.

217.   Defendant Dreibelbis, having direct knowledge of Plaintiff's medical needs through review of Plaintiff's medical records, either tolerated or acquiesced

in and encouraged CCS and its employees at SCI Smithfield to pursue their policy and practice of discontinuing pain medication and withholding follow-up surgical evaluations from inmates in serious medical need, including Plaintiff.

218.    Defendants Noel, Ginchereau, Montag, White, Norris, Silva, and Oppman, having constructive knowledge of Plaintiff's medical needs through their access his medical records and their duty to review such records in the course of their assigned duties at DOC, declined to monitor, enforce, and comply with provisions of the contracts between DOC and CCS that were meant to provide health care for Plaintiff, including medical management of chronic pain and, eventually, a follow-up evaluation with a neurosurgeon.

219.    Defendants Dreibelbis, Noel, Grinchereau, Montag, White, Norris, Silva, Oppman, and DOC inflicted cruel and unusual punishment on Plaintiff both through policies, practices, and protocols that they developed in cooperation with Defendant DOC under the contract between CCS and DOC and through their acquiescence in practices and policies followed by CCS that were contrary to contractual terms that the DOC employees were required to monitor and enforce.

220.    Among the policies, practices, and protocols required by the contracts between CCS and DOC that CCS failed to provide, and DOC employees failed to enforce, are:

- provision of palliative care;

- provision of a chronic care clinic for pain management;

- provision of specialty medical services including care by specialists in pain medicine, physical therapy, and neurosurgery;

- development of a pain medicine protocol and pain management guidelines;

- development of a formulary and pharmacotherapeutic practices for provision of pain medication along with procedures for requesting non-formulary medication;

- protocols for follow-up on the recommendations of specialists including return visits;

- training in pain management for inmates living with chronic pain; and

- provision for annual monitoring of disabled veterans at a Veterans Administration hospital.

221.   Among the policies, practices, and protocols instituted in the contracts

between CCS and DOC that directly inflict cruel and unusual punishment are:

- the financial incentive for CCS to reduce prescriptions for NSAIDs without medical need;

- the financial incentive for CCS to reduce or eliminate visits to hospitals and to medical specialists outside the prison regardless of medical needs for such visits;

- subversion of therapeutic relationships by fostering an adversarial stance between CCS health care providers and their inmate patients by encouraging litigation, providing several modes of litigation assistance;  and

- engendering discord between CCS health care providers and their inmate patients by assisting DOC staff to resist grievances by having CCS health care staff personally confronting inmates in the context of grievance reviews.

222.    Among the policies, practices, and protocols that inflict cruel and
unusual punishment but are not imposed by the contracts are:

- the use of primary care physicians instead of specialists to treat chronic severe pain;
- the abrupt halt of Tramadol and other pain medication, whether on the instructions of DOC, the instructions of CCS, or the initiative of one or more of their employees;
- the practice of denying inmate patients the follow-up visits recommended by specialty medical providers;
- the practice of postponing indefinitely the performance reviews and "quality control meetings" that are mandated by contract and by DOC policy at regular intervals at the state, regional, and local level; and
- the policy of non-enforcement of specific contract provisions as described herein.

223.    In their denial of medical treatment to Plaintiff and their flouting of
the terms of the health care contracts, Defendants acted with deliberate indifference
to Wisniewski's serious medical need, and their actions have no rational
connection to any legitimate state interest or correctional purpose.

224.    As a result of Defendants' deliberate indifference to his serious
medical needs, Plaintiff sustained the injuries described herein.

## Count III
## Breach of Contract
## (Defendant CCS)

225.    Paragraphs 1 through 202 are incorporated here by reference.

226.   CCS entered into contracts with DOC on September 1, 2014 and July 9, 2015 to provide health care for the benefit of Plaintiff and other inmates of DOC's prisons, in which CCS undertook to provide health care for inmates, including arrangement for specialty care including surgery, pain management, and physical therapy, in exchange for payment of forty-nine million nine hundred eighty-seven thousand dollars ($49,987,000.00) during 2014-2015 and another three hundred thirteen million eight hundred eighty-six thousand nine hundred dollars ($313,886,900.00) during 2015-2021, in monthly payments throughout the contract periods.

227.   DOC made timely payments to CCS as provided in the contracts, but CCS failed to arrange for specialty care for Plaintiff as required in the contracts, with the result that Plaintiff's health has deteriorated.

228.   Plaintiff, an intended third-party beneficiary, is entitled to specific performance of the current contract by CCS because the remedies available to him at law, such as monetary damages, cannot fully compensate Plaintiff for loss of health and mobility, and because CCS completely controls his access to health care as a state prisoner.

229.   As a result of the breaches of the contracts by CCS, Plaintiff sustained injuries described herein.

230.   This Honorable Court may enjoin specific performance of CCS's current contract with DOC for provision of specialty medical care for Plaintiff by CCS.

231.   Plaintiff is entitled to damages for the injuries he sustained through breaches of the contracts by CCS through its employees.

**Count IV**
**Professional Malpractice**
**(Defendants Frommer, Dancha, Dreibelbis, Noel, Ginchereau, Norris, Silva)**

232.   Paragraphs 1 through 202 are incorporated here by reference.

233.   Defendants Frommer and Dancha, licensed for the practice of osteopathic medicine, either supervised or directly provided health care services to Plaintiff for several years, as described herein, but the care that they provided failed to meet minimum community standards for competent professional care.

234.   Defendant Driebelbis, licensed as a registered nurse, reviewed Plaintiff's medical records but failed to notify his superiors at the DOC's Bureau of Health Care Services that Plaintiff was receiving substandard care and was being denied the recommended treatment for chronic debilitating pain, with the result that the substandard care continued.

235.   Defendants Noel and Ginchereau, licensed for the practice of medicine, and Defendants Norris and Silva, licensed registered nurses, having

constructive knowledge of Plaintiff's medical needs through their access to his medical records and their duties to oversee them, participated in the development of policies, practices, and protocols by Correct Care Solutions, LLC, that they knew would effectively deny adequate medical care to inmates like Plaintiff, or they tolerated and acquiesced in such policies, practices, and protocols, and/or failed to exercise appropriate supervisory control over the care provided by Correct Care Solutions, LLC, in violation of the standard of care, despite having a professional and contractual obligation to monitor the quality of the health care provided by CCS.

236.    As a result of the inferior care provided by CCS through Frommer and Dancha on some occasions, their refusal to provide any care at all on other occasions, and as a result of the collusion of Defendant Dreibelbis in this pattern of inferior care, and the encouragement of substandard care by DOC through Defendants Noel, Ginchereau, Norris, and Silva, the Plaintiff sustained the injuries described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court:

A.    Award declaratory relief to Plaintiff by finding that Defendants violated his state and federal constitutional rights in the manner described herein;

B.   Award injunctive relief to Plaintiff by enjoining specific performance by CCS of its contractual obligations to arrange for specialty care for Plaintiff through pain management, physical therapy, and neurosurgery, if elected, for the duration of CCS's contract with DOC;

C.   Award injunctive relief to Plaintiff by ordering CCS to resume administration of pain medication at the dosages prescribed prior to August 4, 2015 until such time as specialty care is instituted in specific performance of the current CCS contract;

D.   Award compensatory damages to Plaintiff against the Defendants;

E.   Award punitive damages to Plaintiff against the Defendants;

F.   Award the costs of this action to Plaintiff including but not limited to those available under 42 U.S.C. § 1988;

G.   Award reasonable attorney's fees to Plaintiff, including but not limited to those available under 42 U.S.C. § 1988; and

H.   Award such other and further relief as this Court may deem appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands that this matter be tried to a jury.

Respectfully submitted,

**/s/ Marianne Sawicki**
MARIANNE SAWICKI
PA  313471
2530 South Blair Avenue
Huntingdon, PA 16652
Phone:       (814) 506-2636
FAX:         (814) 644-6884
MarianneSawicki@verizon.net
Attorney for Thomas Wisniewski

Date:   September 19, 2016

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS WISNIEWSKI, | : | No. 1:16-cv-1626-YK |
| | : | |
| Plaintiff, | : | PROFESSIONAL LIABILITY |
| | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| JAMES F. FROMMER, Jr., D.O., et al., | : | |
| | : | |
| | : | Electronically Filed |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify on this 19th day of September, 2016, that I caused the

foregoing Second Amended Complaint to be served on the following through the

electronic case filing system of the Court.

> Samuel H. Foreman, Esquire
> sforeman@wglaw.com
> Caitlin J. Goodrich, Esquire
> cgoodrich@wglaw.com
>
> Weber, Gallagher, Simpson, Stapleton, Fires & Newby, LLP
> Four PPG Place, 5th Floor
> Pittsburgh, PA 15222
> Attorneys for Defendants

> **/s/ Marianne Sawicki**
> MARIANNE SAWICKI
> Attorney for Thomas Wisniewski